IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHERRY STEPHENS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-05-2570 |
| | § | |
| JO ANNE B. BARNHART, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Sherry Stephens' (" Stephens") and Defendant Jo

Anne B. Barnhart's, Commissioner of the Social Security Administration (the " Commissioner"),

cross-motions for summary judgment.  Stephens appeals the determination of an Administrative

Law Judge (" the ALJ") that she is not entitled to receive Title II disability insurance benefits or

Title XVI supplemental security income benefits.  *See* 42 U.S.C. §§ 405(g), 205(g).  Having

reviewed the pending motions, the submissions of the parties, the pleadings, the administrative

record, and the applicable law, it is this Court's opinion that Stephens' Motion for Summary

Judgment or, in the alternative, Motion for Judgment on the Pleadings (Docket Entry No. 9) be

denied, the Commissioner's Motion for Summary Judgment (Docket  Entry No. 11) be granted,

and the ALJ's decision denying benefits be affirmed.

I.      ***Background***

On December 31, 2002, and February 4, 2003, respectively, Stephens filed applications for

supplemental security income and disability insurance benefits, alleging that she had been disabled

since December 6, 2002, due to mental impairments.  (R. 4, 18, 85, 90).  Both applications were

denied initially and on reconsideration.  (R. 18, 54-67).  Stephens requested, and was granted, an administrative hearing before an ALJ to review the decisions.  (R. 68-69).  A hearing was held on October 5, 2004, in Houston, Texas, at which the ALJ heard testimony from Stephens, Mabry Anderson, Stephens' mother, and Lorie McQuade, a vocational expert (" VE").  (R. 26-51).  In a decision dated October 26, 2004, the ALJ denied Stephens'  application for benefits.  (R. 18-24). Stephens appealed the decision to the Appeals Council of the SSA' s Office of Hearings and Appeals, which, on July 1, 2005 (R. 6-9), declined to review the ALJ' s determination, rendering the ALJ' s opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Stephens filed her original complaint in this case on July 25, 2005, seeking judicial review of the Commissioner' s denial of her claims for benefits.  *See* Docket Entry No. 1.

**II.**	__*Analysis*__

      **A.**	__**Statutory Bases for Benefits**__

      SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R.  § 416.110.  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long she has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements
> for eligibility, the earliest month for which we can pay you benefits is the month
> following the month you filed the application.  If you file an application after the
> month you first meet all the other requirements for eligibility, we cannot pay you
> for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, January 2003, fixes the

earliest date from which benefits can be paid.  Eligibility for SSI payments, however, is not

dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Social security disability insurance benefits are authorized by Title II of the Act and are

funded by social security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY

HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are

forced into involuntary, premature retirement, provided they are both *insured* and *disabled*,

regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve

months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315;

*Ortega v. Weinberger*, 516 F.2d `005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107

F.3d 1290, 1295 (7th Cir. 1997).

While these are separate and distinct programs, applicants seeking benefits under either

statutory provision must prove " disability" within the meaning of the Act, which defines disability

in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3),

1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  Under both provisions, disability is

defined as " the inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months."  *See* 42

U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).  Moreover, the law and regulations governing the

determination of disability are the same for both disability insurance benefits and SSI.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

    **B.**    ***Standard of Review***

        **1.**    ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.  The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

2.      *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

C.      *ALJ's Determination*

An ALJ must engage in a five-step inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

5

2.      An individual who does not have a " severe impairment" will not be found to be disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.      An individual who " meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.      If an individual is capable of performing the work she has done in the past, a finding of " not disabled" must be made.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.      If an individual' s impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 705.  The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his or her existing impairments, the burden shifts back to the claimant to prove that he or she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id.*

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v.*

*Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if she demonstrates an " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).   " Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a),(b), 416.972.

A medically determinable " physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).   " [A]n individual is ' under a disability, only if [her] impairments are of such severity that he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .' " *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.      The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.      The claimant's bipolar disorder[1] is a "severe" impairment, based upon the requirements in the Regulations (20 C.F.R. § 404.1520 and 416.920). Her history of marijuana and alcohol abuse in remission does not result in a "severe" impairment.

4.      This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimants allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the following residual functional capacity: sedentary, light, and medium work, performing simple, repetitive tasks.

7.      The claimant is unable to perform any of her past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(R. 22-23). As to the fifth step, the ALJ concluded:

8.      The claimant is an "individual of advanced age" (20 C.F.R. §§ 404.1563 and 416.963).

9.      The claimant has a "high school (or high school equivalent) education" (20 C.F.R. §§ 404.1564 and 416.964).

10.     The claimant does not have transferable skills (20 C.F.R. §§ 404.1568 and 416.968).

---

[1] "Bipolar disorder" refers to mood disorders characterized by a history of manic, mixed, or hypomanic episodes, usually with concurrent or previous history of one or more major depressive episodes, including Bipolar I disorder, Bipolar II disorder, and Cyclothymic disorder. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 528 (29th ed. 2000).

Case 4:05-cv-02570   Document 12-1   Filed in TXSD on 07/28/06   Page 9 of 30

11. The claimant has no exertional limitations (20 C.F.R. §§ 404.1545 and 416.945).

12. Considering the range of work at all levels that the claimant is still functionally capable of performing, in combination with her age, education, and work experience, and using section 204.00 of the Medical-Vocational Guidelines as a framework for decision-making, the claimant is not disabled.

13. The claimant was not under a " disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

(R. 23).

This court' s inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ' s findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Stephens' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff' s subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff' s age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ, and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

9

**D.      *Issues Presented***

Stephens contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Stephens claims that the ALJ erred by (1) not fully assessing whether she has the basic mental abilities to perform work activities in her residual functional capacity assessment; (2) failing to find that her impairments met or equaled the requirements of Listing 12.04, Bipolar Disorder; and (3) failing to apply the appropriate legal standards in assessing the credibility of witness testimony. *See* Docket Entry No. 9. The Commissioner disagrees with Stephens' contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).

**E.      *Review of the ALJ's Decision***

**1.      *Objective Medical Evidence and Opinions of Physicians***

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

10

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments is equivalent to or greater than a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

(1)(I)    If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

(A)    You do not exhibit one or more of the medical findings specified in the particular listing, or

(B)    You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii)    We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records submitted in connection with Stephens' administrative hearing reveals that on June 25, 2000, Stephens was admitted to the psychiatric intensive care unit at Memorial Hermann Southwest Hospital from the emergency room with psychotic depression. (R. 130-134).  At the time of her admission, Stephens' drug screen was positive for marijuana. (R. 133).  The attending physician Jorge A. Raichman, M.D. ("Dr. Raichman") noted that Stephens had a long history of psychiatric problems characterized as psychotic depression and complicated by substance dependance, including alcohol, cocaine, and marijuana. (R. 132).  With medications, she improved and became less depressed and less psychotic upon discharge. (R. 130). On June 29, 2000, Dr. Raichman discharged Stephens with diagnoses of major depression,[2]

---

[2]  " Depression" is a mental state of depressed mood characterized by feelings of sadness, despair, and discouragement.  *See* DORLAND'S, *supra*, at 477.

recurrent, with psychotic features,[3] polysubstance dependence, and stress urinary incontinence. (R. 130).

On December 6, 2002, Stephens involuntarily was admitted to University of Texas-Harris County Psychiatric Center (" HCPC").  (R. 137-148).  It was reported by the attending physician Donna T. Rocha, M.D. (" Dr. Rocha") that Stephens arrived at HCPC agitated, delusional and screaming, requiring immediate medication.  (R. 137).  Stephens admitted that she had been non-compliant with her medications, had no slept for three days, and had been under stress at home due to her brother having had a fall rendering him a paraplegic, discord with her sister, and dealing with aging parents.  (R. 137).  On admittance, Stephens was evaluated with a global assessment of functioning (" GAF") of 18.[4]  It was noted that during her hospital stay Stephens was compliant with treatment and medications.  (R. 137).  Her mood was euthymic[5] with no agitation, suicidal or homicidal ideations.  (R. 137).  Additionally, no overt psychosis or bizarre behavior was observed.  (R. 137).  Stephens was diagnosed with bipolar disorder and, at discharge, she was

---

[3]  " Psychotic features" refers to a person exhibiting psychosis.  " Psychosis refers to a mental disorder characterized by gross impairment in reality testing as evidenced by delusions, hallucinations, markedly incoherent speech, or disorganized and agitated behavior, usually without apparent awareness on the part of the patient of the incomprehensibility of his behavior.  *See* DORLAND' S, *supra*, at 1489-1490.

[4]  A GAF score represents a clinician' s judgment of an individual' s overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (" DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning.  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range.  A GAF rating of 18 indicates some danger of hurting herself or others (*e.g.*, suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (*e.g.*, smears feces) or gross impairment in communication (*e.g.*, largely incoherent or mute).  *See id* at 34.

[5]  " Euthymia" refers to a state of mental tranquility and well-being; neither depressed nor manic.  *See* DORLAND' S, *supra*, at 62.

evaluated with a GAF rating of 40.[6]  (R. 137-138).  After her discharge, Stephens was treated by

the Mental Health Mental Retardation Authority of Harris County (" MHMRA").  (R. 180-197).

On December 16, 2002, MHMRA evaluated her GAF rating as 48.[7]  (R. 182).  On a different

psychiatric rating scale, Stephens rated herself as having moderate symptoms in the areas of

somatic[8] concern, unusual thought content, and conceptual disorganization.  (R. 191).  In every

other area, she marked herself as having either mild, very mild, or not present ratings.  (R. 191).

In a follow-up visit to MHMRA on February 10, 2003, Stephens self-reported having

symptom severity of three on a scale of one to ten; the physician rated Stephens has having two

positive side effects, with a zero out of ten side effect severity rating.  (R. 212).  It was further

reported that Stephens'  overall functioning was rated a seven out of ten.  (R. 212).  It was noted

that Stephens was " doing good" and a follow-up appointment was to be scheduled in six weeks.

(R. 213).

On March 19, 2003, Henry M. Hanna, Ph.D. (" Dr. Hanna"), completed a Psychiatric

Review Technique Form (" PRTF") on Stephens for the SSA.  (R. 148-161).  Dr. Hanna included

bipolar syndrome as being an existing disorder.  (R. 151).  On the PRTF, Dr. Hanna noted that

---

[6]  A GAF rating of 40 indicates some impairment in reality testing or communication (*e.g.*, speech is at
times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family
relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable
to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See*
DSM-IV-TR, *supra*, at 34.

[7]  A GAF rating of 48 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals,
frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no
friends, unable to keep a job).  *See* DSM-IV-TR, *supra*, at 34.

[8]  " Somatic" describes anything pertaining to or characteristic of the soma or body.  *See* DORLAND' S,
*supra*, at 1663.

as to the " B" criteria of Listing 12.04 (affective disorders) and 12.09 (polysubstance dependence), Stephens was only moderately limited in all categories. (R. 158). As to the " C" criteria of Listing 12.04, Dr. Hanna determined that no evidence exists to establish the presence of the " C" criteria. (R. 159).

Dr. Hanna also completed a Mental Residual Functional Capacity Assessment on Stephens. (R. 162-164). Dr. Hanna found that Stephens was markedly limited in two areas, including the ability to understand and remember detailed instructions and the ability to carry out detailed instructions. (R. 162). In all other categories, Stephens was reported as either moderately limited or not significantly limited at all. (R. 162-163). On April 9, 2003, a medical consultant reviewed Stephens' assessments and agreed with the findings. (R. 166-169). Additionally, on July 10, 2003, A. Boulos, M.D. reviewed and affirmed the assessments. (R. 148, 166).

In a follow-up visit to MHMRA on March 24, 2003, it was reported that Stephens had several strengths, including good communication skills, the ability to participate in treatment, a stable environment, good physical health, the ability to care for self and others, and good intellectual skills. (R. 177). Also noted were several barriers to treatment, including frequently blames others, impaired decision making ability, inability to care for self/others, financial difficulties, little insight into problems, socially withdrawn, and memory impairment. (R. 178).

On May 5, 2003, Stephens had a symptom severity of only two out of ten, an overall side effect severity of four out of ten, and she was functioning at a level of eight out of ten. (R. 209). The progress note completed on this visit revealed that she was " sleeping good." (R. 209). At Stephens' next visit to MHMRA on May 30, 2003, it was noted that Stephens was " doing better,"

15

had a side effect severity rating of zero, and was functioning at a level of eight out of ten.  (R. 206).

Stephens' MHMRA records from June 27, 2003, reported that Stephens was doing " much better," had a side effect severity of two out of ten, and was functioning at a level of seven out of ten.  (R. 204).  It was noted that Stephens had only mild symptoms of depression, and she had strengths of good communication skills, ability to participate in treatment, stable environment, good physical health, ability to care for self and others, and good intellectual skills.  (R. 171).  Over the next several months, Stephens' medical records showed that she never had a side effect severity that exceeded two out of ten and her overall functioning level never dropped below a level of six out of ten.  (R.  227, 233, 241, 254).

On April 2, 2004, MHMRA reported that Stephens had no severe symptoms, an overall side effect severity of two out of ten, and an overall functioning level of seven out of ten.  (R. 269).  Finally, on June 11, 2004, it was noted that Stephens had only mild symptoms of depression, and had strengths including history of treatment compliance, motivated for treatment, good communication skills, ability to participate in treatment, good physical health, ability to care for self and others, and good intellectual skills.  (R. 262).

" [O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d at 485.   Moreover, a treating

16

physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza,* 219 F.3d at 395; *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers*, 238 F.3d at 621; *Newton* 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994). It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

Stephens claims that at step three of the sequential evaluation process, the ALJ erred by not indicating which of the Listed impairments were considered. *See* Docket Entry No. 9. In the ALJ's decision, the ALJ refers to Stephens' mental disorder as bipolar disorder. (R. 20, 23). Although the ALJ did not specifically identify Listing 12.04 which includes bipolar syndrome, the ALJ did use the term "bipolar disorder" in his opinion, essentially referring to Listing 12.04. (R. 20, 23).

Stephens also maintains that she has met Listing for 12.04(c), which would render her disabled.[9] Stephens contends that the "C" criteria has been met because she and her mother both

---

[9] Listing 12.04(C) provides as follows:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with

testified that she had been living with her mother and stepfather for the previous two years; she is scared to live alone; she is taken by her mother on errands; she is taken to the store and to medical appointments; she spends 19-20 hours per day in her room; and she has no planned or scheduled daily activities.  *See* Docket Entry No. 9.  Stephens encourages the court to apply the rule described  in *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), which explained:

> In our view, an examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for that decision.  This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Secretary's decision is supported by substantial evidence.

Stephens acknowledges that the Fifth Circuit has not followed this rule, but argues that in *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994), the Court noted that the "Fifth Circuit applies its own strictures that effectively reach the same result." Stephens fails to mention; however, that in *Falco*, the Fifth Circuit observed that "we find the rigid approach in *Cotter* unnecessary." *Id*. Moreover, Falco is inapposite as that case dealt with the ALJ rejecting the plaintiff's subjective complaints of pain without explanation and not with the failure to identify a specific listing.  *See id*. at 164.  Stephens also argues that when evidence favors the Plaintiff, the ALJ must articulate

---

symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.    Repeated episodes of decompensation, each of extended duration; or
2.    A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

his reasons for rejecting the evidence.  *See Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988).

This case is distinguishable from *Abshire* because the medical evidence does not favor Stephens;

instead, the medical evidence demonstrates that Stephens has only mild symptoms resulting from

her impairment.  (R. 158-164, 168, 171-172, 222, 229-230, 233, 237, 241, 243, 245, 257, 259,

262).  As such, there is substantial evidence supporting the ALJ's decision.

### 2.    *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective

complaints.  *See Falco*, 27 F.3d at 163 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th

Cir. 1981)).  When a plaintiff alleges disability resulting from pain, she must establish a medically

determinable impairment that is capable of producing disabling pain.  *See Ripley*, 67 F.3d at 556

(citing 20 C.F.R. § 404.1529).   Once a medical impairment is established, the subjective

complaints of pain must be considered along with the medical evidence in determining the

individual's work capacity.  *See id.*

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints

are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott*

*v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.

The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations

because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 n.18.

Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective

complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*,

862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529;

*Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522

19

(citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281. It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort. *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706. However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Stephens and her mother both testified regarding Stephens' increased sleep as a result of the side effects of Stephens' medications. (R. 44, 171, 177, 209, 211, 224, 229, 234, 237, 242, 250, 255, 257, 262, 274). Contrary to Stephens' assertion, the ALJ's decision indicates that the ALJ did consider objective and subjective indicators related to the severity of Stephens' complaints:

20

The claimant testified that she could not work because of a poor memory, paranoia, crying spells, and seeing and hearing things. The claimant stated that she worked at home as an appointment clerk. She explained that she could not handle the job because of her poor memory. She said she had trouble doing the work and talking to customers. The claimant said her long range memory is pretty good but her immediate memory is poor. She stated that she believed people were looking at her through holes in her apartment ceiling. The claimant stated that her medications (Exhibit B11F, page 2) make her sleepy. She said she sleeps over 8 hours a night and is " sleeping her life away." The claimant stated she was hospitalized because she was " bad off." She is now treated at MHMRA. She said she goes once a month for a medical review to get her medicine. The claimant testified she is single. She gets up at 9:30 AM and goes back to bed at 10:00 AM. She sleeps till 6:30 PM. She stated she has lived with her mother and father for the past two years. She was scared to live alone in her apartment. The claimant said she watches TV. Her mother takes her on errands and to the store. She said she does not want to go places on her own. She stated she had help filling out the Social Security papers. She had help getting to the hearing. She goes to family get togethers every three months. She can dress and bathe herself. She said she does small household chores. She stays in her room with her cat. The claimant' s mother testified that the claimant has lived with her for the past five years. She stated that the claimant gets up at 9:00 AM, goes back to bed at 10:00 [AM], and sleeps until 3:00 PM. Then the claimant goes back to bed at 9:00 PM. She stated the claimant takes her medicines by herself. She stated the claimant gets confused. She explained that she took her to her doctor' s appointment. Later, after they were back at home, the claimant asked when they were going to the appointment. She stated the claimant does odd things. She is able to take care of her cat. She stated the claimant is able to wash dishes. She stated the claimant is paranoid. She stated the claimant tried to train her cat.

The claimant' s allegations of a total disability are not credible. The claimant testified that she things her medicines make her sleepy. However, MHMRA notes indicate the claimant has no side effects (Exhibit B10F, page 2). MHMRA notes indicate the claimant has only mild depression, anxiety and paranoia (Exhibit B10F, page 2). The claimant reported only mild symptoms of depression (Exhibit B10F, page 7). On a Brief Psychiatric Rating Scale, the claimant had only mild to very mild symptoms, except for a severe somatic concern (Exhibit B9F, page 23). The state agency physicians found the claimant can understand, remember and carry out simple instructions (Exhibit B5F).

(R. 20-21). The ALJ' s findings are supported by the medical records.

Indeed, although Stephens claims the onset of her disability was December 6, 2002 (*i.e.*, the date of admission to UT-Harris County Psychiatric Center), it was noted that Stephens had been non-compliant with her medications. (R. 137). After her medications were reestablished, Stephens was discharged from the hospital with a euthymic mood with no agitation; she did not have suicidal or homicidal ideations; she did not display overt psychosis[10] or bizarre behaviors; and she did not demonstrate dangerousness to herself or others. (R. 137). It is well settled that impairment that can be reasonably remedied or controlled by treatment cannot support a finding of disability. *See Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

Moreover, in a disability report dated January 4, 2003, Stephens listed her reasons for not being able to work as the inability to concentrate, dizziness, panic attacks, and not being compatible with coworkers. (R. 90). On February 10, 2003, MHMRA reported that Stephens had an overall side effect severity of zero out of ten, and an overall functioning level of seven out of ten. (R. 212). On March 24, 2003, she had a side effect severity of three out of ten and was functioning at the level of five out of ten. (R. 210). On May 5, 2003, had a side effect severity of four out of ten and an overall functioning of eight out of ten. (R. 208). By May 30, 2003, Stephens had a zero out of ten side effect severity and an overall functioning level of eight out of ten. (R. 206). Finally, on June 27, 2003, she had an overall side effect severity of two out of ten and an overall functioning level of seven out of ten. (R. 204). On this same date, MHMRA reported that Stephens had strengths that included good communication skills, good intellectual

---

[10] " Psychosis" refers to a mental disorder characterized by gross impairment in reality testing  as evidenced by delusions, hallucinations, markedly incoherent speech, or disorganized and agitated behavior, usually without apparent awareness on the part of the patient of the incomprehensibility of his behavior. *See* DORLAND'S, *supra*, at 1489.

skills, a stable environment, and the ability to care for herself and others.  (R. 171).  Stephens'

medical records continued to show either low or no side effect severity as well as an overall

functioning level that did not drop below six out of ten over the next year.  (R. 233, 241, 254,

259, 266, 269).

The subjective complaints by Stephens are simply not corroborated by objective medical

evidence.  The evidence that Stephens attempts to rely on is completely based on the statements

made by herself and her mother at the administrative hearing.  The ALJ's decision contained

specific reasons for his findings on Stephens' credibility pursuant to SSR 96-7 that were

supported by the medical records.  Consequently, there is substantial evidence to support the

conclusions of the Commissioner and the ALJ.  *See Richardson v. Perales*, 402 U.S. 389, 401

(1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

### 3.     *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> only if [her] physical or mental impairment or impairments are of such severity that
> [she] is not only unable to do [her] previous work but cannot, considering [her]
> age, education, and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy, regardless of whether such
> work exists in the immediate area in which [she] lives, or whether a specific job
> vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  If a claimant demonstrates that she cannot perform

her past relevant work, the Commissioner bears the burden of proving that her functional capacity,

age, education, and work experience allow her to perform work in the national economy.  *See*

*Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d

at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  Once the Commissioner fulfills this

burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey*, 230 F.3d at 135.

To determine whether an applicant can return to a former job or, if never employed, can perform substantial work in the national economy, the regulations require the ALJ to evaluate the applicant's residual functional capacity ("RFC"). *See Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983) (citing 20 C.F.R. §§ 404.1561, 416.961). This term of art merely designates the ability to work despite physical or mental impairments. *See id.*; *see also* 20 C.F.R. §§ 404.1545, 416.945. "Residual functional capacity" combines a medical assessment with the descriptions by physicians, the applicant or others of any limitations on the applicant's ability to work. *See id.* When a claimant's RFC is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See* 20 C.F.R. §§ 404.1561, 416.961. The testimony of a vocational expert is valuable in this regard, as "[she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Carey*, 230 F.3d at 145; *see also Masterson*, 309 F.3d at 273; *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986). In the absence of contrary evidence, the ALJ may properly rely on the testimony of a vocational expert in reaching a conclusion regarding a claimant's RFC to perform work available in the national economy. *See Masterson*, 309 F.3d at 273.

Moreover, under certain circumstances, the ALJ's application of the medical-vocational guidelines set forth in Appendix 2 of Subpart P of the regulations, also referred to as the grids,

24

without testimony from a vocational expert, is sufficient to assess whether a claimant is able to work or is disabled under the Act. *See Heckler v. Campbell*, 461 U.S. 458, 467, 470 (1983). As the Supreme Court explained in *Campbell*:

> These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress–physical ability, age, education, and work experience–and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

461 U.S. at 461-62 (footnotes omitted). The Court elaborated:

> Each of these four factors is divided into defined categories. A person's ability to perform physical tasks, for example, is categorized according to the physical exertion requirements necessary to perform varying classes of jobs—*i.e.*, whether a claimant can perform sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. § 404.1567. Each of these work categories is defined in terms of the physical demands it places on a worker, such as the weight of objects [she] must lift and whether extensive movement or use of arm and leg controls is required. *Ibid*.

*Id.* at 462 n.3.

Under the regulations, impairments can be either exertional or nonexertional. *See Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs. *Id.* The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *See id.*;

*see also* 20 C.F.R. § 404.1569(a).  All other impairments are classified as nonexertional.  *See*

*Sykes*, 228 F.3d at 263.

In evaluating RFC, the Fifth Circuit has looked to SSA rulings (" SSR").  The Social

Security Administration' s rulings are not binding on this court, but they may be consulted when

the statute at issue provides little guidance.  *See Myers*, 238 F.3d at 620 (citing *B.B. ex rel. A.L.B.*

*v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981)).  In *Myers*, the Fifth Circuit relied on SSRs

addressing residual functional capacity and the interplay of exertional and nonexertional factors:

> First, SSR 96-8p provides that a residual functional capacity (RFC) " is an
> assessment of an individual' s ability to do sustained work-related physical and
> mental activities in a work setting on a regular and continuing basis."  " A ' regular
> and continuing basis'  means 8 hours a day, for 5 days a week, or an equivalent
> work schedule."  " The RFC assessment is a function-by-function assessment based
> upon all of the relevant evidence of an individual' s ability to do work-related
> activities."  " However, without the initial function-by-function assessment of the
> individual' s physical and mental capacities, it may not be possible to determine
> whether the individual is able to do past relevant work. . . ."  RFC involves both
> exertional and nonexertional factors.  Exertional capacity involves seven strength
> demands:  sitting, standing, walking, lifting, carrying, pushing, and pulling.
> " Each function must be considered separately."  " In assessing RFC, the
> adjudicator must discuss the individual' s ability to perform sustained work
> activities in an ordinary work setting on a regular and continuing basis. . . ."  The
> RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (quoting 61 Fed. Reg. 34474-01 (July 2, 1996)).  The court also noted that SSR 96-9p defines

exertional capacity as the aforementioned seven strength demands and requires that the

individual' s capacity to do them on a regular continuing basis be stated.  *See id*.  Thus, to

determine that an applicant can do a given type of work, the ALJ must find that the applicant can

meet the job' s exertional and nonexertional requirements on a sustained basis and can maintain

regular employment.  *See Watson*, 288 F.3d at 218; *Singletary v. Bowen*, 798 F.2d 818, 821 (5th

Cir. 1986); *Carter*, 712 F.2d at 142 (citing *Dubose v. Mathews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform. *See Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569(b)). Nevertheless, "use of the grid rules is only appropriate 'when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect [her] residual functional capacity.' " *Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza v. Apfel*, 219 F.3d 378, 398 (5th Cir. 2000); *Newton*, 209 F.3d at 458. If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy. *See id.* Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC. *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

Here, Stephens suffers from nonexertional impairments (*i.e.*, mental impairments); thus, it was proper for the ALJ to rely on a vocational expert to establish that suitable jobs exist in the economy. *See Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza v. Apfel*, 219 F.3d 378, 398 (5th Cir. 2000); *Newton*, 209 F.3d at 458. The ALJ determined that "due to her mental limitations, she cannot perform any of her past relevant work." (R. 23). The ALJ

reached this conclusion by considering the following testimony of a vocational expert (VE).   (R.

21).

> Q:     Ms. McQuade, let me give you some hypothetical questions.   Say we have
> an individual who's the same age, education and vocational experience as
> the claimant.   And, Counsel, for the first part – first hypothetical I'm
> going to look to the State Agency assessment given at B-5-F (INAUDIBLE)
> so the individual is further limited to simple repetitive tasks.   Would that
> eliminate all the Claimant's past relevant work?
>
> A:     Yes, sir.
>
> Q:     Would it leave any other jobs in the regional or national economy?
>
> A:     Sir, it would narrowly leave unskilled employment that's administratively
> noticed by the Commissioner that was either sedentary, light or medium.
>
> Q:     And that would be in the millions, right?
>
> A:     Correct

(R. 48-49).

Stephens argues that the ALJ improperly equated " simple, repetitive" work to " unskilled"

work and, in doing so, improperly declined to consider limitations involved in her mental  RFC

that allows for only unskilled work.  *See* Docket Entry No. 9.  The assumption that the ALJ meant

" unskilled" when he said " simple, repetitive" is an improper assumption.   The ALJ never stated

or suggested that simple and repetitive tasks and unskilled work are synonymous.   The VE is the

party who used the term " unskilled" in her testimony.  (R. 48-49).   In his decision, the ALJ found

that Stephens'  residual functional capacity was sedentary, light, and medium work, performing

simple repetitive tasks.   (R. 23).   Contrary to Stephens'  assertion, the ALJ did not limit

Stephens'  RFC by the ability to perform only unskilled work.   The ALJ limited the RFC only

by the need to perform " simple, repetitive tasks," which Stephens admits is significantly less

28

involved than a limitation to only unskilled work.  (R. 23).  The ALJ did not use the word " unskilled" in any of his findings.  (R. 22-23).  In fact, the only time the ALJ actually used the word " unskilled," he was evaluating the evidence regarding the transferability of skills, and not articulating one of his findings regarding Stephens' RFC.  (R. 22).  Therefore, it is improper to assume that the ALJ meant unskilled work when he found that Stephens retained the ability to perform " simple, repetitive tasks."  (R. 21).

Stephens' brief goes into an exhaustive discussion describing " unskilled" work and the demands and capabilities of people performing " unskilled" work.  More specifically, Stephens contends that the implicit RFC finding that limits her to unskilled work ignores her alleged limitations in her ability to use judgment, her ability to complete a normal work day without psychologically based interruptions, her ability to interact with others, and her impaired memory. *See* Docket Entry No. 9.  Stephens relies on SSR 85-15 which states:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and to deal with changes in a routine work setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.  This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base

As set forth above, the ALJ's decision did not equate " simple, repetitive tasks" to " unskilled" work; hence, the above provision is inapplicable.

## III.   *Conclusion*

In sum, the record provides substantial evidence supporting the Commissioner's decision that Stephens is not disabled.  It is, therefore

ORDERED that Stephens'  Motion for Summary Judgment or, in the alternative, Motion for Judgment on the Pleadings (Docket Entry No. 9) is **DENIED.**  It is further

ORDERED that the Commissioner' s Motion for Summary Judgment (Docket  Entry No. 11) is **GRANTED**.  It is further

ORDERED that the Commissioner' s decision is **AFFIRMED.**  Finally, it is

ORDERED that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas on this the 28th day of July, 2006.

Calvin Botley
United States Magistrate Judge

30